TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2426
    Facsimile: (213) 894-0142
    E-mail:   Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 2:21-cv-1832 |
|        Plaintiff, | <u>VERIFIED COMPLAINT FOR FORFEITURE</u> |
|        v. | 18 U.S.C. §§ 981(a)(1)(A); (a)(1)(C) |
| REAL PROPERTY LOCATED IN LOS ANGELES, CALIFORNIA, | [I.R.S.] |
|        Defendant. | |

    The United States of America brings this claim against the above-captioned defendant ("the Defendant Assets"), and alleges as follows:

**JURISDICTION AND VENUE**

    1.   This is a civil forfeiture action brought pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

2.    This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3.    Venue lies in this District pursuant to 28 U.S.C. § 1395(a).

## PERSONS AND ENTITIES

4.    The plaintiff is the United States of America ("plaintiff" or the "government").

5.    The Defendant Assets are:

a.    All right and title to real property in Los Angeles, California (APN 4328-019-004) (the "BEDFORD PROPERTY"), including all appurtenances, improvements, and attachments thereon.

6.    KUWAITI OFFICIAL 1 was the Minister of Defense of Kuwait between 2013 and 2017. KUWAITI OFFICIAL 1 served as the Chief of General Staff of the Kuwaiti Armed Forces from 2012 to 2013. Prior to March 2012, KUWAITI OFFICIAL 1 was a Lieutenant General in the Kuwaiti Armed Forces. During each of these times, KUWAITI OFFICIAL 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv).

7.    KUWAITI OFFICIAL 2 was the Kuwaiti Deputy Minister of Defense from 2008 to 2017. Prior to becoming Deputy Minister of Defense, KUWAITI OFFICIAL 2 was the Assistant Deputy for Financial Affairs of the Ministry of Defense from 2001 through 2008. During each of these times, KUWAITI OFFICIAL 2 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv).

8.    MAO OFFICIAL 1 was the head of the Kuwaiti Ministry of Defense's Military Attaché Office in London (the "MAO") between 2010 and in or about 2017. During this time, MAO OFFICIAL 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv).

9.   Victorino Noval ("NOVAL") is an individual who resides in Los Angeles County, California. NOVAL was formerly known as "Victor Jesus Noval" but changed his name following a 2003 conviction for mail fraud, in violation of 18 U.S.C. § 1341, and tax evasion, in violation of 26 U.S.C. § 7201. On September 24, 2003, NOVAL was ordered by the Hon. J. Spencer Letts of the United States District Court of the Central District of California to pay $25,358,494 in restitution to the victims of the mortgage fraud scheme leading to his criminal conviction.

10.   Victor Franco Noval ("FRANCO") is an individual who resides in Los Angeles County, California, and is the son of NOVAL.

11.   Charles "Chip" Dickens ("DICKENS") is an individual who resides or resided in Los Angeles County, California during the relevant period, and is the former manager of Tower Park Properties, LLC.

12.   Tower Park Properties, LLC, ("TPP") is an entity incorporated in the State of Delaware in or about 2003 and registered in the State of California in 2004. DICKENS was the manager of TPP during all or part of the relevant period described in this Complaint.

13.   Secured Capital Partners, LLC, ("SCP") is a California entity formed in or about 2010, with a principal place of business in Los Angeles, California. FRANCO is the manager of SCP, or was during all or part of the relevant period described in this Complaint.

14.   8484 Wilshire Blvd LLC ("8484 Wilshire") is a California entity formed in or about 2012, with a principal place of business in Los Angeles, California. FRANCO is the manager of 8484 Wilshire, or

was during all or part of the relevant period described in this Complaint.

15.   The Awal Trust ("AWAL"), on information and belief, was created in or about 2012.[1] KUWAITI OFFICIAL 1 is both the grantor and trustee of AWAL. According to a trust agreement dated February 23, 2012, and corresponding signature page notarized on or about December 17, 2012, AWAL's beneficiaries are the five children of KUWAITI OFFICIAL 1, namely M.K.A.-1, M.K.A.-2, A.K.A., S.K.A., and J.K.A., and the spouse of KUWAITI OFFICIAL 1, A.M.A. FRANCO purported to be an authorized agent of AWAL until in or about 2015.

16.   The Rexford Trust ("REXFORD") was created under the laws of California in or about 2009. FRANCO is both the grantor and trustee of REXFORD. The REXFORD trust document identifies the sons of NOVAL as the trust beneficiaries.

17.   Beverly Hills Real Estate Holdings, LLC, ("BHREH") is a California entity formed in or about 2010, with a principal place of business in Los Angeles, California. FRANCO is the manager of BHREH, or was during all or part of the relevant period described in this Complaint. As of January 1, 2015, AWAL and REXFORD each held a 50% interest in BHREH.

18.   LA Stars, LLC, ("LA STARS") was incorporated in the State of California in or about 2007. NOVAL is the managing manager of LA STARS, or was during all of part of the relevant period described in this Complaint.

---

[1] According to an unsigned copy of the trust document obtained from First Choice Bank, AWAL was formed on or about February 23, 2012. While it does not specifically state that it is created under California law, the instrument includes several references to California law.

19.   Ahli United Bank ("AUB") is a financial institution headquartered in Manama, Bahrain, with branches in cities including Kuwait City, Kuwait, and London, UK.

20.   National Bank of Kuwait ("NBK") is a financial institution headquartered in Kuwait City, Kuwait, with branches in cities including London, UK. The government of Kuwait, including through departments such as the Ministry of Defense, maintains accounts at NBK for official government purposes.

21.   The interests of the State of Kuwait, KUWAITI OFFICIAL 1, KUWAITI OFFICIAL 2, NOVAL, FRANCO, TPP, SCP, BHREH, LA STARS, DICKENS, Hughes Investment Partnership, LLC, and Fiduciary Trust International of California (acting as interim successor trustee of the Mark Hughes Family Trust) may be adversely affected by these proceedings.

22.   Contemporaneously with the commencement of this action, the government is filing a related *in rem* civil forfeiture action against the following defendants:

       a.   $762,201.48 seized from U.S. Bank account ending x8773 (the "U.S. BANK x8773 FUNDS") held in the name of Rexford Trust, Victor Franco Noval Trustee;

       b.   $961,136.43 seized from Wells Fargo Bank account ending x0383 (the "WF BANK x0383 FUNDS") held in the name of Secured Capital Partners, LLC;

       c.   $397,883.73 seized from Wells Fargo Bank account ending x1199 (the "WF BANK x1199 FUNDS") held in the name of Victor Franco Noval; and

1        d.    $299,774.37 seized from Wells Fargo Bank account

2 ending x2356 (the "WF BANK x2356 FUNDS") held in the name of Blue

3 Orchid Financial, LLC.

4     23.    The government previously filed seven related *in rem* civil

5 forfeiture actions, against the following defendants:

6        a.    Case Number 20-cv-6313-KAS-KS, <u>United States v. All</u>

7 <u>Right and Title to real Property Known as the Mountain of Beverly</u>

8 <u>Hills</u>,[2] seeking forfeiture of all right and title to real property

9 commonly known as 1652 Tower Grove Drive in Beverly Hills, California

10 (APN NOS. 4384-034-002; 4384-034-003; 4384-034-004; 4384-034-005;

11 4384-034-006; 4384-034-007; 4384-034-008; 4384-034-009; 4384-034-010;

12 4384-034-011; 4384-034-012; 4384-034-013; 4384-034-014; 4384-019-002;

13 4384-019-003; 4384-019-015, and 4384-019-017), also known as the

14 Mountain of Beverly Hills (the "MOUNTAIN") or the Vineyard at Beverly

15 Hills, including all appurtenances, improvements, and attachments

16 thereon;

17        b.    Case Number 20-cv-6314-KAS-KS, <u>United States v. Real</u>

18 <u>Property Located in Los Angeles, California</u>, seeking forfeiture of

19 all right and title to real property in Los Angeles, California (APN

20 4360-033-012) (the "WILSHIRE 402 PROPERTY"), including all

21 appurtenances, improvements, and attachments thereon;

22        c.    Case Number 20-cv-6316-KAS-KS, <u>United States v. Real</u>

23 <u>Property Located in Los Angeles, California</u>, seeking forfeiture of

24 all right and title to real property in Los Angeles, California (APN

25

26

27

28    [2] On September 28, 2020, the government dismissed without prejudice Case No. 20-cv-6313-CAS, pursuant to Fed.R.Civ.P. 41(a)(1)(A).

1  4360-033-112) (the "WILSHIRE PENTHOUSE PROPERTY"), including all

2  appurtenances, improvements, and attachments thereon;

3         d.   Case Number 20-cv-6318-KAS-KS, United States v. Real

4  Property Located in Beverly Hills, California, seeking forfeiture of

5  all right and title to real property in Beverly Hills, California

6  90210 (APN 4350-001-018) (the "ALTA PROPERTY"), including all

7  appurtenances, improvements, and attachments thereon;

8         e.   Case Number 20-cv-6319-KAS-KS, United States v. Real

9  Property Located in Beverly Hills, California, seeking forfeiture of

10  all right and title to real property in Beverly Hills, California

11  (APN 4348-003-014) (the "MARILYN PROPERTY"), including all

12  appurtenances, improvements, and attachments thereon;

13         f.   Case Number 20-cv-6320-KAS-KS, United States v. Real

14  Property Located in Beverly Hills, California, seeking forfeiture of

15  all right and title to real property in Beverly Hills, California

16  (APN 4348-013-030) (the "SUMMIT PROPERTY"), including all

17  appurtenances, improvements, and attachments thereon;

18         g.   Case Number 20-cv-6321-KAS-KS, United States v. One

19  British Aerospace BAE125 Series 800A Aircraft Bearing Registration

20  Number N716BB, et al., seeking forfeiture of the following property:

21         i.   All right and title to one British Aerospace

22  BAE125 Series 800A aircraft bearing registration number N716BB (the

23  "BAE125 JET"), and its tools and appurtenances, including any and all

24  logbooks (hard copy and/or electronic) documenting engine and

25  airframe maintenance, flights, number of hours flown, number of

26  landings and types and frequency of instrument approaches made by the

27  aircraft;

28

1               ii.   All right and title to one 2011 Azimut 68' 68S

2    Yacht, bearing hull number XAX68SANE011 (the "AZIMUT YACHT"), and its

3    tools, appurtenances, and associated logbooks;

4               iii. All right to and interest in the Hertz Investment

5    Group Midwest Office Portfolio (the "HERTZ INVESTMENT") owned, held

6    or acquired, directly or indirectly, by the Rexford Trust and/or

7    Victor Franco Noval as trustee of the Rexford Trust, including but

8    not limited to any right to collect and receive any profits and

9    proceeds therefrom, and any interest derived directly or indirectly

10   from the proceeds invested in HERTZ INVESTMENT by the Rexford Trust

11   and/or Victor Franco Noval as trustee of the Rexford Trust;

12              iv.   All right and title to one 2014 Lamborghini

13   Aventador automobile bearing vehicle identification number

14   ZHWUR1ZD3ELA02540 and Montana license number LYYT (the "2014

15   LAMBORGHINI"), and its tools, appurtenances, and associated logbooks;

16              v.    All right and title to assorted Manny Pacquiao

17   memorabilia purchased between March and April of 2015, for

18   approximately $40,000.00 (the "PACQUIAO MEMORABILIA").

19   **EVIDENCE SUPPORTING FORFEITURE**

20   Background

21      24.   The State of Kuwait ("Kuwait") is a country located on the

22   Arabian Peninsula adjacent to the Persian Gulf.

23      25.   Kuwait is a constitutional emirate governed by a

24   constitution promulgated in 1962. The government of Kuwait is divided

25   between the Emir, a cabinet appointed by the Emir, and an elected

26   parliament in the form of the National Assembly of Kuwait (the

27   "National Assembly").

28

26.  Kuwait's Ministry of Defense ("MOD") is a governmental body of Kuwait, responsible for the implementation of the government's defense policy and governing all branches of the Kuwait Armed Forces. The MOD consists of more than 58,000 personnel and manages a defense budget which generally exceeds $5,000,000,000.00 annually.

27.  The budget and financial affairs of the MOD are the responsibility of the Ministry of Defense Financial Affairs Department ("MODFAD").

28.  The MOD operates under the direction of the Kuwaiti Minister of Defense (the "Minister"). The Minister is appointed by the Emir, but the National Assembly has the right to summon, question, and remove ministers appointed by the Emir, including the Minister.

29.  The MOD maintains military liaison offices in certain foreign countries, including in the United Kingdom. The MAO is the MOD's military liaison office in the United Kingdom.

30.  One function of the MAO is the administration of official Kuwaiti bank accounts in London in the name of the MOD or MAO, overseen by MODFAD.

Kuwaiti Law on Public Funds and Governmental Transactions

31.  Under the laws of Kuwait, public funds are protected and inviolable, whether inside or outside Kuwait.

32.  Under the laws of Kuwait, before any ministry may open a foreign bank account, the ministry must notify and obtain approval from the Kuwaiti Ministry of Finance ("MOF"), or a financial authority designated by MOF, such as MODFAD.

33.  Under the laws of Kuwait, a government ministry must register approved foreign bank accounts with MOF and/or MODFAD and

also enter all transactions for any such foreign bank account in official registers and preserve supporting documentation of any such transactions.

34.   Finally, under the laws of Kuwait, a government ministry must provide reports to the state audit authority every six months disclosing foreign investments and holdings, and provide the status of any such investments.

## The Unauthorized MAO Accounts

35.   In or about 2010, MAO OFFICIAL 1 became the head of the MAO in London. With that position, MAO OFFICIAL 1 assumed oversight over the MAO and all financial accounts and assets administered by the MAO.

36.   During this handover of authority, as required by Kuwaiti law, MAO OFFICIAL 1 received and accepted an official accounting of the assets, bank accounts, and cash holdings of the MAO at that time (the "Handover Accounting").

37.   The Handover Accounting identified six AUB accounts and seven NBK accounts in the name of the MAO at that time, with a total balance of less than $14 million.

38.   In fact, however, both KUWAITI OFFICIAL 2 and MAO OFFICIAL 1 knew that the Handover Accounting was incomplete, and that additional accounts in the name of the MAO existed and were in use by KUWAITI OFFICIAL 2 and others, in violation of Kuwaiti law.

39.   Rather than inform MOF, MODFAD, or any state audit authority of the accounts missing from the Handover Accounting, MAO OFFICIAL 1, KUWAITI OFFICIAL 1, KUWAITI OFFICIAL 2, and others known and unknown conspired to open additional accounts in the name of the

MAO, without authorization from MOF or MODFAD, and fund these accounts with Kuwaiti public funds for their own personal use.

40.   While head of the MAO, and with the knowledge of KUWAITI OFFICIAL 1 and KUWAITI OFFICIAL 2, MAO OFFICIAL 1 opened at least six AUB Accounts in the name of the MAO, denominated in Euros, GBP and USD (the "AUB MAO Accounts"). The AUB MAO Accounts consisted of:

a.   AUB MAO Account ending x3470;

b.   AUB MAO Account ending x4481;

c.   AUB MAO Account ending x4910;

d.   AUB MAO Account ending x5277;

e.   AUB MAO Account ending x6496; and

f.   AUB MAO Account ending x6559.

41.   None of the AUB MAO Accounts were reported to or registered with MOF or MODFAD.

42.   None of the AUB MAO Accounts were properly recorded in the MAO's books and records in accordance with Kuwaiti law.

43.   Once opened, the AUB MAO Accounts were funded by tens of millions of dollars, Euros, and GBP in transfers into the AUB MAO Accounts from Kuwaiti government accounts at NBK, including Kuwaiti governmental accounts at NBK ending x2501, x9099, x9103.

44.   In order to execute these transfers, KUWAITI OFFICIAL 2 executed a series of transfer directives to NBK (the "NKB Transfers"), including:

a.   On or about December 15, 2011, KUWAITI OFFICIAL 2 executed a transfer letter directed to NBK's London branch office requesting the transfer of €23,500,000.00 from NBK Account x2501 to AUB MAO Account x5277. The requested transfer was executed on or

about December 19, 2011, and was equivalent to approximately $30,662,800.00 as of that date.

  b.   On or about September 12, 2012, KUWAITI OFFICIAL 2 executed a transfer letter directed to NBK's London branch office requesting the transfer of €30,000,000.00 from NBK Account x2501 to AUB MAO Account x5277. The requested transfer was executed on or about September 18, 2012, and was equivalent to approximately $39,360,000.00 as of that date.

  c.   On or about September 19, 2013, KUWAITI OFFICIAL 2 executed a transfer letter directed to NBK's London branch office requesting the transfer of 30,000,000.00 GBP from NBK Account x9099 to AUB MAO Account x4481. The requested transfer was executed on or about October 1, 2013, and was equivalent to approximately $48,591,000.00 as of that date.

  d.   On or about October 8, 2014, KUWAITI OFFICIAL 2 executed a transfer letter directed to NBK's London branch office requesting the transfer of $8,840,000.00 from NBK Account x9103 to AUB MAO Account x6402. The requested transfer was executed on or about October 14, 2014.

  e.   On or about February 20, 2015, KUWAITI OFFICIAL 2 executed a transfer letter directed to NBK's London branch office requesting the transfer of $60,000,000.00 from NBK Account x9099 to AUB MAO Account x6496. The requested transfer was executed on or about February 25, 2015.

  45.   The NBK Transfers were not entered into MAO books and records in accordance with Kuwait law, and were not disclosed to, or approved of by, MOF or MODFAD.

46.   The AUB MAO Accounts were also funded by the liquidation of Kuwaiti government funds held on fixed deposit in other MAO accounts at AUB, including:

a.   On or about January 11, 2012, a fixed deposit of MOD funds at AUB in the amount of $14,361,490.64 was liquidated and deposited into AUB MAO Account x3470.

b.   On or about September 21, 2012, a fixed deposit of MOD funds at AUB in the amount of $18,000,000.00 was liquidated and deposited into AUB MAO Account x3470.

47.   The January 11, 2012 and September 21, 2012 liquidations of Kuwaiti government funds held on fixed deposit at AUB were not entered into MAO books and records as required by Kuwaiti law, and were not disclosed to, or approved of by, MOF or MODFAD.

<u>Tens of Millions of Dollars Were Transferred from the AUB MAO
Accounts to Bank Accounts in California</u>

48.   In or about 2010, KUWAITI OFFICIAL 1 and NOVAL entered into an agreement to invest in property in the Los Angeles area, and specifically, to purchase, develop, and resell the MOUNTAIN.

49.   On or about November 23, 2010, NOVAL and KUWAITI OFFICIAL 1 executed a partnership agreement for LA STARS, granting KUWAITI OFFICIAL 1 a 50% interest in LA STARS in return for a series of payments totalling no less than $20,000,000.00, to be made no later than March 1, 2011.

50.   To execute this agreement, KUWAITI OFFICIAL 1, NOVAL, and FRANCO created a series of entities and opened bank accounts in the name of certain of these entities, including:

a.   In or about February 2012, KUWAITI OFFICIAL 1 created AWAL under the laws of California, naming himself as the trustee.

13

KUWAITI OFFICIAL 1 named FRANCO as his authorized agent with respect to AWAL.

b. In or about December 2012, NOVAL and/or FRANCO created BHREH under the laws of California, naming FRANCO as the sole manager.

c. On or about January 1, 2013, FRANCO executed an Operating Agreement for BHREH as an "authorized agent" of KUWAITI OFFICIAL 1, himself acting as trustee of AWAL. AWAL, in turn, was identified in the Operating Agreement as a 50% beneficial owner of BHREH.

d. On or about January 1, 2015, FRANCO executed a certification on behalf of BHREH, certifying that AWAL held a 50% interest in BHREH.

e. On or about January 1, 2015, FRANCO, as manager of BHREH, executed a promissory note addressed to KUWAITI OFFICIAL 1, acting as trustee of AWAL, promising to pay AWAL $69,962,881.00 upon demand, and entitling AWAL to 50% of the profits on any sale of the MOUNTAIN, in return for unspecified value previously received.

51. Concurrent to these agreements between KUWAITI OFFICIAL 1, NOVAL, and FRANCO, between January 2012 and April 2015, KUWAITI OFFICIAL 1 directed the transfer of no less than $104,380,000.00 from the AUB MAO Accounts to bank accounts held in the State of California designated by NOVAL and FRANCO (the "AUB MAO Transfers"):

a. Beginning on or about January 13, 2012, at least $8,200,000.00 was transferred from the AUB MAO Accounts to an account in the name of Fullerton, Lemann, Schaefer, and Dominick, LLP

("FLSD")[3] at Wells Fargo Bank, in Los Angeles, California (the "FLSD Account"). Specifically:

    i.   On or about January 13, 2012, $1,800,000.00 was transferred from AUB MAO Account x3470 to the FLSD Account.

    ii.  On or about January 13, 2012, $2,400,000.00 was transferred from AUB MAO Account x3470 to the FLSD Account.

    iii. On or about February 14, 2012, $2,000,000.00 was transferred from AUB MAO Account x3470 to the FLSD Account.

    iv.  On or about May 1, 2012, $2,000,000.00 was transferred from AUB MAO Account x3470 to the FLSD Account.

    b.   On or about August 8, 2012, $1,000,000.00 was transferred from AUB MAO Account x3470 to a bank account in the name of SCP.

    c.   Beginning on or about September 21, 2012, at least $95,180,000.00 was transferred from the AUB MAO Accounts to two accounts at Comerica Bank ("Comerica") in Los Angeles, California, as follows: (1) an account in the name of "8484 Wilshire Blvd LLC - Levene Neale Bender Yoo Brill, LLP TTEE," with account number ending in x7075 (the "Comerica 8484 Wilshire TTEE x7075 Account"); and (2) an account in the name of "8484 Wilshire Blvd LLC" with account number ending in x6559 (the "Comerica 8484 Wilshire x6559 Account"). Specifically:

    i.   On or about September 21, 2012, $9,500,000.00 was transferred from AUB MAO Account x3470 to the Comerica 8484 Wilshire TTEE x7075 Account.

---

[3] FLSD is a law firm based in San Bernardino, California which represented NOVAL and/or entities NOVAL controlled, including LA STARS. D.C., a partner at FLSD, was identified as the agent for service on BHREH's articles of incorporation.

15

ii.   On or about September 28, 2012, $5,500,000.00 was transferred from AUB MAO Account x3470 to the Comerica 8484 Wilshire TTEE x7075 Account.

iii. On or about December 5, 2012, $5,000,000.00 was transferred from AUB MAO Account x3470 to the Comerica 8484 Wilshire TTEE x7075 Account.

iv.   On or about May 20, 2014, $13,000,000.00 was transferred from AUB MAO Account x6496 to the Comerica 8484 Wilshire TTEE x7075 Account.

v.    On or about October 14, 2014, $4,680,000.00 was transferred from AUB MAO Account x6496 to the Comerica 8484 Wilshire x6559 Account.

vi.   On or about April 9, 2015, $57,500,000.00 was transferred from AUB MAO Account x6496 to the Comerica 8484 Wilshire x6559 Account.

52.   None of the AUB MAO Transfers were reported to MOF, MODFAD, or any other Kuwaiti state audit authority in any biannual reports.

53.   None of the AUB MAO Transfers were recorded in the MAO's books and records in accordance with Kuwaiti law

54.   In order to disguise the nature of the AUB MAO Transfers, some of the transfers were falsely described as for military purposes. In one instance, a transfer to the Comerica 8484 Wilshire x6559 Account was identified as for the "technical development at the new Kuwait military academy under construction," but in truth, neither the MOD nor MAO had any contractual or business relationship with FLSD, SCP, or 8484 Wilshire, nor is there any Kuwaiti military academy either in Beverly Hills or anywhere else in California.

1 <u>Funds from the AUB MAO Transfers Were Laundered Through Banks in the</u>

2 <u>State of California</u>

3     55.  On October 3, 2012, $7,700,000.00 was transferred from the

4 Comerica 8484 Wilshire TTEE x7075 Account to a Comerica account in

5 the name of 8484 Wilshire, with an account ending in x7356 (the

6 "Comerica 8484 Wilshire x7356 Account"). All or substantially all of

7 this $7,700,000.00 is traceable to the AUB MAO Transfers.

8     56.  On October 31, 2012, $500,000.00 was transferred from the

9 Comerica 8484 Wilshire x7356 Account to a Comerica account in the

10 name of SCP, with an account ending in x7315 (the "Comerica SCP x7315

11 Account"). Between December 17, 2012 and April 29, 2013, a further

12 $1,904,235.69 was transferred from the Comerica 8484 Wilshire x7356

13 Account into the Comerica SCP x7315 Account through sixteen

14 transfers. On November 28, 2012, $1,000,000.00 was transferred from

15 the Comerica 8484 Wilshire TTEE x7075 Account to the Comerica SCP

16 x7315 Account. On May 22, 2014, Comerica cashier's check #246569 in

17 the amount of $2,200,000.00 was purchased from the Comerica 8484

18 Wilshire TTEE x7075 Account, and then deposited in full into the

19 Comerica SCP x7315 Account. On March 23, 2015, a further $940,455.17

20 was transferred from the Comerica 8484 Wilshire x6559 Account into

21 the Comerica SCP x7315 Account. All or substantially all of this

22 $6,544,690.86 is traceable to the AUB MAO Transfers.

23     57.  On August 15, 2013, $900,000.00 was transferred from the

24 Comerica 8484 Wilshire x6559 Account to a Comerica account in the

25 name of SCP, subtitled "Creditor Buyout Account," ending in x6567

26 (the "Comerica SCP Buyout x6567 Account"). On May 21, 2014, Comerica

27 cashier's check #246570 in the amount of $800,000.00 was purchased

28 from the Comerica 8484 Wilshire TTEE x7075 Account, and then

deposited in full into the Comerica SCP Buyout x6567 Account. On April 2, 2015, a further $200,000.00 was transferred from the Comerica SCP x7315 Account into the Comerica SCP Buyout x6567 Account. All or substantially all of this $1,900,000.00 is traceable to the AUB MAO Transfers.

58.   On October 16, 2014, $10,019,166.68 was withdrawn by cashier's check from the Comerica 8484 Wilshire TTEE x7075 Account and deposited into the Comerica 8484 Wilshire x6559 Account, and the Comerica 8484 Wilshire TTEE x7075 Account was closed. All or substantially all of this $10,019,166.68 is traceable to the AUB MAO Transfers.

59.   Between October 31, 2012 and June 6, 2013, eight transfers, totaling $1,793,580.00, were made from the Comerica 8484 Wilshire x7356 Account to an account at Comerica in the name of SCP, subtitled "Construction Account," with account number ending x7331 (the "Comerica SCP Construction x7331 Account"). On November 29, 2012, $1,000,000.00 was transferred from the Comerica SCP x7315 Account to the Comerica SCP Construction x7331 Account. On August 12, 2013, $3,000,000.00 was transferred from the Comerica 8484 Wilshire x6559 Account to the Comerica SCP Construction x7331 Account. On May 22, 2014, a further $640,000.00 was transferred from the Comerica SCP x7315 Account to the Comerica SCP Construction x7331 Account. All or substantially all of this $6,433,580.00 is traceable to the AUB MAO Transfers.

60.   On April 21, 2015, $57,500,000.00 was transferred from the Comerica 8484 Wilshire x6559 Account to an account at Comerica in the name of "Beverly Hills Real Estate Holdings LLC", account number

18

ending x6373 ("Comerica BHREH x6373 Account") All or substantially all of this $57,500,000.00 is traceable to the AUB MAO Transfers.

61.   Following the final AUB MAO Transfer of $57,500,000.00, Comerica opened a compliance investigation into NOVAL, FRANCO, 8484 Wilshire, and BHREH based on an unrelated wire transfer request made by FRANCO.

62.   Following its investigation, Comerica closed the Comerica 8484 Wilshire x6559 Account, the Comerica SCP x6567 Account, and the Comerica BHREH x6373 Account on or about July 2, 2015, and issued FRANCO a cashier's check, numbered #322217, for $57,500,000.00. All or substantially all of this $57,500,000.00 is traceable to the AUB MAO Transfers.

63.   FRANCO then attempted to open an account in the name of BHREH with First Choice Bank ("FCB"), a financial institution located in Cerritos, California.

64.   On or about July 10, 2015, FCB opened an account for BHREH on a provisional basis, pending completion of due diligence on BHREH (the "BHREH FCB Provisional Account"). During FCB's due diligence process, FRANCO represented to FCB's compliance personnel that he was an authorized agent of KUWAITI OFFICIAL 1 and AWAL.

65.   FRANCO deposited cashier's check #322217 in the BHREH FCB Provisional Account.

66.   FCB returned the full amount of cashier's check #322217, however, after KUWAITI OFFICIAL 1 failed to appear in person and execute an authorization confirming both that FRANCO was authorized to act on behalf of AWAL, and FRANCO's representations to FCB as to the source of the funds deposited in the BHREH FCB Provisional Account.

67.   FCB then issued FRANCO cashier's check #9800692 for $57,500,000.00 and closed the BHREH FCB Provisional Account. All or substantially all of this $57,500,000.00 was traceable to the AUB MAO Transfers.

68.   Following the closure of the BHREH FCB Provisional Account, FRANCO attempted to open an account for BHREH with another Los Angeles-based financial institution, Banc of California ("BOC").

69.   In order to open an account for BHREH with BOC, FRANCO represented to BOC that funds to be deposited belonged to KUWAITI OFFICIAL 1 personally, when in fact, these funds had been misappropriated from Kuwait.

70.   On January 7, 2016, FRANCO deposited cashier's check #9800692 in the amount of $57,500,000.00 in an account at BOC held by BHREH, account number ending in x6481 ("BOC BHREH x6481 Account"). All or substantially all of this $57,500,000.00 is traceable to the AUB MAO Transfers.

71.   On January 21, 2016, $8,000,000.00 was transferred from BOC BHREH x6481 Account to an account at BOC in the name of FRANCO, with account number ending in x4459 ("BOC FRANCO x4459 Account"). All or substantially all of this $8,000,000.00 is traceable to the AUB MAO Transfers.

72.   On January 21, 2016, $8,000,000.00 was wired from the BOC FRANCO x4459 Account to Alta Standard One, LLC ("ASO") for the purchase of the ALTA PROPERTY, but that property was ultimately purchased with other funds.

73.   On or about February 4, 2016, $8,002,410.96 was wired from the ASO account at First American Title Company to an account at BOC in the name of SCP, with account number ending in x6580 ("BOC SCP

x6580 Account"). All or substantially all of this $8,002,410.96 is traceable to the AUB MAO Transfers.

74.   On September 30, 2016, $27,424,902.98 was transferred from BOC BHREH x6481 Account to BOC SCP x6580 Account. All or substantially all of this $27,424,902.98 is traceable to the AUB MAO Transfers.

75.   On September 30, 2016, $30,000,000.00 was transferred from the BOC SCP x6580 Account to an account at Morgan Stanley Smith Barney Wealth Management ("MSWM") in the name of "Rexford Trust TTEE Victor Franco Noval," with account number ending in x7996-053 (the "MSWM Rexford Trust x7996-053 Account"). All or substantially all of this $30,000,000.00 is traceable to the AUB MAO Transfers. These funds were used as collateral for a line of credit at MSWM in the name of "The Rexford Trust," with account number ending in x8035-053 ("MSWM Rexford Trust x8035-053 Account").

76.   On November 29, 2016, $21,590,755.41 was transferred from the MSWM Rexford Trust x7996-053 Account to an account at Wells Fargo Advisors ("WFA") in the name of "Rexford Tr Victor Franco Noval TTEE U/A DTD 10/20/2009," with account number ending in x6591 ("WFA Franco Rexford Tr x6591 Account"). All or substantially all of this $21,590,755.41 was traceable to the AUB MAO Transfers.

<u>KUWAITI OFFICIAL 1 and AWAL Sue NOVAL, FRANCO, SCP and Others in</u>
<u>California Superior Court for Fraud</u>

77.   In or about September 2019, KUWAITI OFFICIAL 1, in his individual capacity as well as on behalf of AWAL, filed suit in the Superior Court of California against NOVAL, FRANCO, DICKENS, SCP, LA STARS, and others, alleging that NOVAL and the other defendants in that action had defrauded KUWAITI OFFICIAL 1 into transferring at

1    least $160 million to entities directed by NOVAL but nominally

2    controlled by FRANCO, based on his agreement with NOVAL to purchase

3    and interest in the MOUNTAIN.

4        THE DEFENDANT ASSETS WERE INVOLVED IN AND/OR TRACEABLE TO THE

5                PROCEEDS OF THE FOREGOING CRIMINAL CONDUCT

6        78.   The MOUNTAIN was involved in and/or improved and maintained

7    using funds traceable to the AUB MAO Transfers. Specifically:

8            a.   As explained above in paragraphs 50-75, substantially

9    all of the funds in each of the Comerica SCP Buyout x6567 Account,

10   the Comerica SCP Construction x7331 Account, and the BOC SCP x6580

11   Account are traceable to the AUB MAO Transfers.

12           b.   On August 16, 2013, $100,000.00 was transferred from

13   the Comerica SCP Buyout x6567 Account to Great Expectations LLC, an

14   entity owned and controlled by DICKENS, the manager of TPP.

15           c.   On October 24, 2014, $40,000.00 was transferred from

16   the Comerica SCP Buyout x6567 Account to DICKENS, the manager of TPP,

17   described as payment for an "Assignment of Claim".

18           d.   Between November 1, 2012 and March 18, 2015, no less

19   than $[4,507,694.38] was transferred from the Comerica SCP

20   Construction x7331 Account for the maintenance, taxes, and

21   improvement of the MOUNTAIN, including:

22               i.   In four transfers between November 1, 2012 and

23   May 22, 2014, $220,463.00 was transferred from the Comerica SCP

24   Construction x7331 Account to third-party Freeman Group / Metro

25   Properties LLC as a "Retainer Tower Park Properties";

26               ii.  In seventeen transfers between November 2, 2012

27   and March 18, 2015, $681,555.10 was transferred from the Comerica SCP

28

Construction x7331 Account to third-party AR Pipeline for "Tower Park/Vineyard Construction" and similar services;

    iii. In fourteen transfers between November 2, 2012 and May 27, 2014, $2,063,411.75 was transferred from the Comerica SCP Construction x7331 Account to third-party Valley Crest Tree Company for "Vineyard Construction" and similar services;

    iv.  In two transfers dated September 24, 2013 and September 25, 2014, $37,840.00 was transferred from the Comerica SCP Construction x7331 Account to third party Arthur J Gallagher and Co. for "General Improvement and Grading Permit Bond Tower Park Prop LLC";

    v.  In three transfers between December 15, 2014 and February 23, 2015, $191,672.45 was transferred from the Comerica SCP Construction x7331 Account to third-party Pierre Landscaping, Inc. for "Tower Park 4 Months Maintenance/Upgrades" and similar services;

    vi.  In five transfers between January 15, 2013 and April 18, 2013, $1,067,357.45 was transferred from the Comerica SCP Construction x7331 Account to third-party Powerful Electric, Inc. for "Vineyard Electrical/Construction" and similar services;

    vii. In two transfers dated September 24, 2013 and September 25, 2014, $245,395.08 was transferred from the Comerica SCP Construction x7331 Account to third-party Soli Stone, Inc. for "Payment on Stone Purchase Vineyard" and similar services;

    e.   Between November 2, 2016 and July 2, 2018, no less than $1,076,411.52 was transferred from the BOC SCP x6580 Account for the maintenance, taxes, and improvement of the MOUNTAIN, including:

i.   On December 18, 2016, $704,934.55 was transferred from the BOC SCP x6580 Account to the Los Angeles County Tax Collector for the "Delinquent Taxes APR #4384 034 014";

ii.   In forty-seven transfers between November 2, 2016 and July 2, 2018, $248,270.00 was transferred from the BOC SCP x6580 Account to third-party M.G. for "1652 Tower Grove Landscaping" and similar services;

79.   The WILSHIRE 402 PROPERTY was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a.   As explained above in paragraphs 50-75, substantially all of the funds in the Comerica 8484 Wilshire x7356 Account are traceable to the AUB MAO Transfers.

b.   On or about October 19, 2012, $1,244,171.92 was transferred from the Comerica 8484 Wilshire x7356 Account to Canon Hills Closing for the purchase of the WILSHIRE 402 PROPERTY, with associated escrow number CH12-7156-ML.

c.   This property was titled in the name of 8484 Wilshire.

80.   The WILSHIRE PENTHOUSE PROPERTY was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a.   As explained above in paragraphs 50-75, substantially all of the funds in the Comerica 8484 Wilshire TTEE x7075 Account are traceable to the AUB MAO Transfers.

b.   On or about October 10, 2012, $6,287,600 was transferred from the Comerica 8484 Wilshire TTEE x7075 Account to West Coast Escrow for the purchase of the WILSHIRE PENTHOUSE PROPERTY, with associated escrow number BH-11710-MN.

c.   This property was titled in the name of 8484 Wilshire.

24

81.  The ALTA PROPERTY was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a.  As explained above in paragraphs 50-75, substantially all of the funds in the BOC BHREH x6481 Account are traceable to the AUB MAO Transfers.

b.  On or about February 1, 2016, $12,611,141.55 was transferred from the BOC BHREH x6481 Account to Commerce Escrow Company ("Commerce Escrow") for the purchase of the ALTA PROPERTY. The total purchase price was $13,000,000.00 and the property was purchased outright without any liens. The remainder of the purchase price for the ALTA PROPERTY was paid by an October 29, 2015 transfer of $390,000.00 to Commerce Escrow from an account in the name of SCP at California Republic Bank with account number ending x0561 (the "CRB SCP x0561 Account"). The CRB SCP x0561 Account was funded by a transfer of $2,400,000.00 on or about June 19, 2015 from the Comerica 8484 Wilshire x6559 Account. As explained above in paragraphs 50-75, substantially all of the funds in the Comerica 8484 Wilshire x6559 Account are traceable to the AUB MAO Transfers.

82.  The MARILYN PROPERTY was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a.  As explained above in paragraphs 50-75, substantially all of the funds in the BOC BHREH x6481 Account are traceable to the AUB MAO Transfers.

b.  On or about July 6, 2012, the Rexford Trust purchased the MARILYN PROPERTY for $6,100,000.00, with a loan from East West Bank in the amount of $4,100,000.00.

c.  The property was titled 50% in the name of Rexford Trust, with FRANCO as trustee, and 50% in FRANCO's name.

d.   On January 28, 2016, $3,894,628.50 was wired from BOC BHREH x6481 Account to East West Bank to pay off the mortgage on the MARILYN PROPERTY in full.

83.   The SUMMIT PROPERTY was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a.   1141 Summit, LLC was created in Los Angeles County on or about December 1, 2016.

b.   On or about November 23, 2016, 1141 Summit, LLC purchased the SUMMIT PROPERTY for $20,400,000.00 with a mortgage of $12,000,000.00 from Private Mortgage Fund, LLC.

c.   As explained above in paragraphs 50-75, substantially all of the funds in the MSWM Rexford Trust x7996-053 Account and the MSWM Rexford Trust x8035-053 Account are traceable to the AUB MAO Transfers.

d.   On November 29, 2016, $21,590,755.41 was transferred from the MSWM Rexford Trust x7996-053 Account to the WFA Franco Rexford Tr x6591 Account. All or substantially all of this $21,590,755.41 are traceable to the AUB MAO Transfers.

e.   The balance of the purchase price was from two wire transfers. The first wire was from a priority credit line related to the WFA Franco Rexford Tr x6591 Account on November 29, 2016 in the amount of $6,200,000.00. The priority credit line was collateralized by funds on deposit at WFA Franco Rexford Tr x6591 Account. The second wire came from the WFA Franco Rexford Tr x6591 Account on or about January 30, 2017 in the amount of $2,661,683.19.

84.   The BAE125 JET was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a.   As explained above in paragraphs 50-75, substantially all of the funds in the BOC SCP x6580 Account are traceable to the AUB MAO Transfers.

b.   On or about August 17, 2016, $660,000.00 was wired from the BOC SCP x6580 Account to Insured Aircraft Title Company for the purchase of the BAE125 JET. The funds were initially wired to purchase another plane, but the deal did not close and the funds were used to purchase the BAE125 JET for $627,000.00. The deal was negotiated by T.T., a known associate of NOVAL. The BAE125 JET was titled in the name Beverly Hills Exotic Collection, LLC, ("BHEC") which was created in the State of Montana.

c.   Per documents provided to escrow for the transaction, Jon Hunter Noval, NOVAL'S son and FRANCO'S brother, is the sole member/owner of BHEC.

d.   Per a due diligence document for the transaction, FRANCO and NOVAL are the beneficial owners of the BAE125 JET, in addition to BHEC and Jon Hunter Noval.

e.   In an August 8, 2016 email to the aircraft title company, FRANCO stated that T.T. was authorized to disburse funds from SCP for the purchase of the aircraft.

f.   Per documents provided by the escrow agent, the BAE125 JET aircraft title was filed with the FAA on or about August 22, 2016.

85.  The AZIMUT YACHT was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a.   As explained above in paragraphs 50-75, substantially all of the funds in the BOC SCP x6580 Account are traceable to the AUB MAO Transfers.

   b. On or about August 19, 2016, BHEC purchased the AZIMUT YACHT from National Liquidators. The purchase price was $820,434.00 and on or about August 10, 2016 $820,035.00 was transferred from BOC SCP x6580 Account to National Liquidators for the purchase of the AZIMUT YACHT.

   c. The AZIMUT YACHT was titled in the name BHEC.

  86. The HERTZ INVESTMENT was purchased using funds traceable to the AUB MAO Transfers. Specifically:

   a. As explained above in paragraphs 50-75, substantially all of the funds in the MSWM Rexford Trust x7996-053 Account are traceable to the AUB MAO Transfers. These funds were used as collateral for a line of credit in the MSWM Rexford Trust x8035-053 Account.

   b. On or about October 28, 2016, $4,500,000.00 was wired from the MSWM Rexford Trust x8035-053 Account to the Hertz Investment Group, LLC, with the note, "To fund Noval Hertz Midwest Portfolio from Rexford Trust line of credit."

  87. The 2014 LAMBORGHINI was purchased using funds traceable to the AUB MAO Transfers. Specifically:

   a. As explained above in paragraphs 50-75, substantially all of the funds in the MSWM Rexford Trust x7996-053 Account are traceable to the AUB MAO Transfers. These funds were used as collateral for a line of credit in the MSWM Rexford Trust x8035-053 Account.

   b. On or about October 19, 2016, $3,893,684.00 was wired from the MSWM Rexford Trust x8035-053 Account for the purchase of 1087 Marilyn Drive, Beverly Hills, California. This real property was subsequently sold, and the proceeds of the sale, $4,162,040.14, were

deposited into the BOC SCP x6580 Account from Chartwell Escrow, Inc. in April and May 2017.

c. On or about August 25, 2017, Beverly Hills Royal Embassy, LLC purchased the 2014 LAMBORGHINI from Evan Paul Motorcars. The purchase price was $324,900.00 and on or about August 25, 2017 a cashier's check #1477230246 for $324,900.00 was purchased with funds from the BOC SCP x6580 Account. The vehicle was titled in the name Beverly Hills Royal Embassy, LLC, which was created in the State of Montana. The transaction was conducted by T.T., an associate of NOVAL's.

88. The PACQUIAO MEMORABILIA was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a. As explained above in paragraphs 50-75, substantially all of the funds in the Comerica SCP x7315 Account are traceable to the AUB MAO Transfers.

b. During March and April of 2015, $40,000.00 was paid to an individual, Cliff Sawyer, towards the purchase of a replica Manny Pacquiao Prize Fighter belt and boots. Payment was made by means of two checks for $20,000.00 each drawn on the Comerica SCP x7315 Account: Check #2070, dated March 4, 2015; and Check #2115, dated April 9, 2015.

89. The BEDFORD PROPERTY was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a. As explained above in paragraphs 50-75, at least $27,424,902.98 traceable to the AUB MAO Transfers was transferred into the BOC SCP x6580 Account. Additionally, on or about March 24, 2017, the BOC SCP x6580 Account received $4,313,585.79 from the MSWM Rexford Trust x7996-053 Account. As described above, at least

1  $30,000,000 of the MSWM Rexford Trust x7996-053 Account is traceable
2  to the AUB MAO Transfers.

3        b.   On or about October 14, 2016, $300,000.00 was wired
4  from the BOC SCP x6580 Account to Better Escrow Service ("Better
5  Escrow"), with escrow reference #003669-SA, as a deposit on the
6  purchase price of the BEDFORD PROPERTY.

7        c.   On or about May 10, 2017, $3,744,000.00 was wired from
8  the BOC SCP x6580 Account to Better Escrow to pay the balance of the
9  purchase price of the BEDFORD PROPERTY.

10     90.   The U.S. BANK x8773 FUNDS are traceable to the AUB MAO
11  Transfers. Specifically:

12        a.   On May 9, 2019, $2,000,000.00 was transferred from an
13  account at Mechanics Bank ending x4010 in the name of SCP (the
14  "Mechanics SCP x4010 Account") to a Mechanics Bank account ending
15  x3940 in the name of Rexford Trust (the "Mechanics Rexford x3490
16  Account").

17        b.   The Mechanics SCP x4010 Account was funded by
18  $13,726,103.60 transferred from Chicago Title Company ("CTC"), at
19  least $13,001,141.55 of which is traceable to the AUB MAO Transfers.
20  Specifically:

21           i.   As explained above in paragraphs 79-82, the ALTA
22  PROPERTY, SUMMIT PROPERTY, MARILYN PROPERTY, and the WILSHIRE
23  PENTHOUSE PROPERTY were purchased using funds traceable to the AUB
24  MAO Transfers.

25           ii.   On or about December 12, 2018, Franco entered a
26  refinancing agreement with an entity, Koronus Holdings, for the ALTA
27  PROPERTY, the SUMMIT PROPERTY, the MARILYN PROPERTY, and the WILSHIRE
28  PENTHOUSE PROPERTY. This refinance cashed out $13,726,103.60 as part

of the closing of the ALTA PROPERTY, and on or about December 12, 2018, $13,726,103.60 was wired from CTC to the Mechanics SCP x4010 Account.

c.   On May 9, 2019, two cashier's checks for $1,000,000 each were purchased out of the Mechanics Rexford x3490 Account, and made payable to CTC.

d.   On or about January 1, 2020, a bank account at JP Morgan Chase Bank ending x8036 in the name of JO Enterprises and Consulting, LLC ("JOEC") received a wire transfer in the amount of $1,999,250 from CTC.

e.   JOEC had received an approximately $2,000,000 loan from FRANCO towards a real estate project that FRANCO would have benefitted from, however, the project fell through and the funds were returned. The funds loaned to JOEC by FRANCO were deposited to CTC, and then returned to FRANCO via check from JOEC in the amount of $2,000,000. Specifically, on or about January 10, 2020, a check for $2,000,000 from JOEC with a note of "365 cp- option Exercised (Exercised illegible)" was deposited into U.S. Bank account ending x8773 in the name of REXFORD (the "USB REXFORD x8773 Account"), from which the U.S. BANK x8773 FUNDS were seized.

f.   On November 12, 2020, a seizure warrant was signed by US Magistrate Judge, the Honorable Alka Sagar.  The warrant was served on U.S. Bank on November 13, 2020, which resulted in the seizure of $762,201.48 by the US Government.

91.  The WF BANK x0383 FUNDS are traceable to the AUB MAO Transfers. Specifically:

a.    As explained above in paragraph 88, the BEDFORD PROPERTY was purchased using funds traceable to the AUB MAO Transfers.

b.    On or about October 30, 2020, Wells Fargo Bank account ending x0383, held in the name of SCP (the "WF SCP x0383 Account") received a wire transfer in the amount of $1,901,605.47 from "Marquee Funding" as payment on a cash-out refinance of real property located in Beverly Hills, California (the BEDFORD PROPERTY).

c.    On November 12, 2020, a seizure warrant was signed by US Magistrate Judge, the Honorable Alka Sagar.  The warrant was served on Wells Fargo Bank on November 13, 2020, which resulted in the seizure of $961,136.43 by the US Government.

92.  The WF BANK x1199 FUNDS are traceable to the AUB MAO Transfers. Specifically:

a.    As described above, the USB REXFORD x8773 Account received at least $2,000,000 traceable to the AUB MAO Transfers.

b.    On or about February 24, 2020, Wells Fargo Bank account ending x1199, held in the name of FRANCO (the "WF FRANCO x1199 Account") received a transfer of $175,000 from the USB REXFORD x8773 Account.

c.    As described above, the WF SCP x0383 Account received at least $1,901,605.47 traceable to the AUB MAO Transfers. In addition, the WF SCP x0383 Account received at least $124,774.37 traceable to the AUB MAO Transfers through distribution from the HERTZ INVESTMENT. As explained above in paragraph 85, the HERTZ INVESTMENT was purchased using funds traceable to the AUB MAO Transfers.

d.    On or about February 5, 2020, the WF FRANCO x1199 Account received a transfer of $225,025 from the WF SCP x0383 Account.

e.    On November 12, 2020, a seizure warrant was signed by US Magistrate Judge, the Honorable Alka Sagar.  The warrant was served on Wells Fargo Bank on November 13, 2020, which resulted in the seizure of $397,883.733 by the US Government.

93.  The WF BANK x2356 FUNDS are traceable to the AUB MAO Transfers. Specifically:

a.    As explained above in paragraphs 50-75, substantially all of the funds in the Comerica SCP x7315 Account are traceable to the AUB MAO Transfers.

b.    As described above, on or about December 12, 2018, $13,726,103.60 was wired from CTC to the Mechanics SCP x4010 Account.

c.    Funds originating in the Mechanics SCP x4010 Account were loaned to Jadelle Jewelry and Diamonds, LLC ("Jadelle"), as detailed below:

| Date | Check#/Wire | Amount | Notes |
|------|-------------|--------|-------|
| 1/25/2019 | Check #1172 | $500,000 | Loan Dated 1/24/2019 |
| 1/25/2019 | Check #1173 | $500,000 | Loan Dated 1/24/2019 |
| 2/27/2019 | Wire Out | $750,000 | Loan Noval |
| 3/8/2019 | Wire Out | $850,000 | Loan |
| 3/26/2019 | Wire Out | $600,000 | Loan |
| 4/19/2019 | Wire Out | $800,000 | Loan with Collateral |

1    d. On or about April 12, 2019, Wells Fargo Bank account

2 ending '2356, held in the name of Blue Orchid Financial, LLC (the "WF

3 BOF x2356 Account") received $400,000 from Jadelle.

4    e. On or about May 3, 2019, the WF BOF x2356 Account

5 received $50,000 from Jadelle with a notation for "Loan Reduction,"

6 payable to FRANCO.

7    f. On or about May 3, 2019, the WF BOF x2356 Account

8 received another $50,000 from Jadelle with a notation for "Interest

9 Payment," payable to FRANCO.

10    g. On November 12, 2020, a seizure warrant was signed by

11 US Magistrate Judge, the Honorable Alka Sagar.  The warrant was

12 served on Wells Fargo Bank on November 13, 2020, which resulted in

13 the seizure of $299,774.37 by the US Government.

14 //

15 //

16 //

1

2

## FIRST CLAIM FOR RELIEF

18 U.S.C. § 981(a)(1)(A)

3  94.  Based on the facts set out above, Plaintiff alleges that

4  the Defendant Assets are involved in, and are traceable to property

5  involved in, one or more transactions or attempted transactions in

6  violation of section 18 U.S.C. §§ 1956(a)(1)(B)(i) (Concealment Money

7  Laundering), (a)(1)(A)(i) (Promotional Money Laundering), and a

8  conspiracy to commit such offenses, in violation of section 18 U.S.C.

9  § 1956(h). Specifically, the Defendant Assets are involved in and

10  traceable to property involved in one or more financial transactions,

11  attempted transactions, and a conspiracy to conduct or attempt to

12  conduct such transactions involving the proceeds of specified

13  unlawful activity; specifically, the misappropriation, theft, or

14  embezzlement of public funds by or for the benefit of a public

15  official, which is a specified unlawful activity under 18 U.S.C.

16  § 1956(c)(7)(B)(iv), and a conspiracy to commit such offenses. The

17  Defendant Assets are therefore subject to forfeiture to the United

18  States pursuant to 18 U.S.C. § 981(a)(1)(A).

19  //

20  //

21  //

22

23

24

25

26

27

28

## SECOND CLAIM FOR RELIEF

18 U.S.C. § 981(a)(1)(C)

95.   Based on the facts set out above, Plaintiff alleges that the Defendant Assets are derived from proceeds traceable to a violation of section 18 U.S.C. § 2314 (International Transportation of Stolen or Fraudulently Obtained Property), and a conspiracy to commit such an offense in violation of section 18 U.S.C. § 371, which constitute specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A), incorporating by reference 18 U.S.C. § 1961(1). The Defendant Assets are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

//

//

//

1      WHEREFORE, plaintiff United States of America prays:

2      (a)   that due process issue to enforce the forfeiture of the

3  Defendant Assets;

4      (b)   that due notice be given to all interested parties to

5  appear and show cause why forfeiture should not be decreed;

6      (c)   that this Court decree forfeiture of the Defendant Assets

7  to the United States of America for disposition according to law; and

8      (d)   for such other and further relief as this Court may deem

9  just and proper, together with the costs and disbursements of this

10 action.

11 Dated: February 26, 2021           TRACY L. WILKISON
                                      Acting United States Attorney
12                                    BRANDON D. FOX
                                      Assistant United States Attorney
13                                    Chief, Criminal Division
                                      STEVEN R. WELK
14                                    Assistant United States Attorney
                                      Chief, Asset Forfeiture Section
15

16                                    ____/s/ Dan G. Boyle_____
                                      DAN G. BOYLE
17                                    Assistant United States Attorney

18                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
19

20

21

22

23

24

25

26

27

28

<u>VERIFICATION</u>

I, NOLAN FULLER, hereby declare that:

1.   I am a Special Agent with Internal Revenue Service – Criminal Investigations, and the case agent for the forfeiture matter entitled *United States of America v. Real Property Located in Los Angeles, California.*

2.   I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3.   Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed  February _11_, 2021 in _El Monte_, California.

_____
NOLAN FULLER
Special Agent
IRS-CI

### ATTACHMENT A

The real property in the City of Beverly Hills, County of Los
Angeles, State of California, described as:

LOT 52 OF TRACT NO. 8982, IN THE CITY OF BEVERLY HILLS, COUNTY
OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK
117, PAGE 99 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF
SAID COUNTY.

Assessor's Parcel No: 4328-019-004